**Case No. 26-1988**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

League of Women Voters of Massachusetts, *et al.*,
*Plaintiffs-Appellees,*

v.

Donald J. Trump, in the official capacity as President of the United States,
*et al.*,
*Defendants-Appellants,*

State of Missouri, *et al.*,
*Defendants*.

*On Appeal from the United States District Court for the District of Massachusetts*
*Case No. 1:26-cv-11549*
*The Honorable Indira Talwani, District Judge*

# BRIEF OF BIPARTISAN FORMER GOVERNORS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

Julia Spiegel
Emily Kirby
Charanya Krishnaswami
Megan Flynn
GOVERNORS ACTION ALLIANCE
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (301) 450-3151

Andrew J. Rising
Carlos Guevara
GOVERNORS SAFEGUARDING DEMOCRACY
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (213) 933-2126

Carey R. Dunne
Kevin Trowel
Mónica Folch
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... II

INTRODUCTION .......... 1

INTEREST OF AMICI .......... 4

ARGUMENT .......... 6

I. Our System of Electoral Federalism .......... 7

II. Electoral Federalism Confers Substantial Benefits on our Nation and Citizenry .......... 9

III. The USPS Rule is Unlawful and Will Sow Confusion Among Election Officials and Voters .......... 15

CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ... 1

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
576 U.S 787 (2015) ... 15

*California v. Trump*,
183 F.4th 52 (1st Cir. 2026) ... 7

*Cnty. of Nassau v. New York*,
724 F. Supp. 2d 295 (E.D.N.Y. 2010) ... 8

*Colorado v. DeJoy*,
No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) ... 8

*Common Cause/New York v. Brehm*,
432 F. Supp. 3d 285 (S.D.N.Y. 2020) ... 8

*Cook v. Gralike*,
531 U.S. 510 (2001) ... 20

*Democratic Nat'l Comm. v. Wis. State Legislature*,
141 S. Ct. 28 (2020) ... 11, 20

*Foster v. Love*,
522 U.S. 67 (1997) ... 15

*Frozen Food Exp. v. United States*,
351 U.S. 40 (1956) ... 20

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ... 6

*Ill. State Bd. Elections v. Socialist Workers Party*,
440 U.S. 173 (1979) ... 7

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ... 7

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) .................................................. 9, 10

*Moore v. Harper*,
600 U.S. 1 (2023) .................................................. 11

*Powell v. McCormack*,
395 U.S. 486 (1969) .................................................. 1

*Printz v. United States*,
521 U.S. 898 (1997) .................................................. 6

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .................................................. 20

*Roudebush v. Hartke*,
405 U.S. 15 (1972) .................................................. 1

*Rucho v. Common Cause*,
588 U.S. 684 (2019) .................................................. 2

*Smiley v. Holm*,
285 U.S. 355 (1932) .................................................. 2

*State v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) .................................................. 3, 7

*State of California v. Trump*,
No. 1:26-cv-11581, 2026 WL 1826490 (D. Mass. June 25, 2026) .................................................. 3

*United States v. Weber*,
No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) .................................................. 11

*U.S. Term Limits, Inc. v. Thornton,*
514 U.S. 779 (1995) .................................................. 1

*Washington v. Trump*,
814 F. Supp. 3d 1173 (W.D. Wash. 2026) .................................................. 15

*Williams v. Rhodes*,
393 U.S. 23 (1968) .................................................. 7

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ........................................................................................1

**U.S. Constitutional Provisions:**

U.S. Const., art. I, § 4, cl. 1 ..........................................................................1, 7

**Statutes:**

39 U.S.C. § 403(c)............................................................................................19

52 U.S.C. § 20501 ..............................................................................................8

52 U.S.C. § 20901 ..............................................................................................8

Mass. Gen. Laws ch. 54, § 89 ..........................................................................18

Mont. Code Ann. § 13-13-211(1) ....................................................................18

Tex. Elec. Code § 84.007(c) ............................................................................18

**Other Authorities:**

*Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966
(Aug. 26, 2026)...............................................................................2, 16, 17, 19

Christopher R. Berry, *Democracy Reform Primer Series: The Timing of Local Elections*, U. Chicago (Jan. 25, 2024) ..............................10

*Disclosure Letter to Senator Blumenthal re: USPS Rushed Implementation of New and Untested IT Systems Threatens U.S. Ballot Mail Delivery* (Aug. 29, 2026) .......................................18

Jess Brouard, *States, Not the President, Run Elections in America*,
State Court Report (Oct. 21, 2025).....................................................................9

Jessica Bulman-Pozen, *Federalism as a Safeguard of the Separation of Powers*, 112 Columbia L. Rev. 459 (2012) ...............................16

*Election Administration at State and Local Levels*,
Nat'l Conf. of State Legislatures (Jan. 13, 2026) ......................................10, 14

Exec. Order No. 14,399, 91 Fed. Reg. 17,125
(Mar. 31, 2026) ...................................................................................................3

The Federalist No. 51 (Alexander Hamilton).......................................................6

The Federalist No. 59 (Alexander Hamilton).....................................................15

Gallup, *Americans Trust Local Government Most, Congress Least* (Oct. 13, 2023) ............12

Lauren Miller Karalunas, *Nevada Election Board Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ............13

Lauren Miller Karalunas, *Ohio Precinct Election Officials: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ............13

Lauren Miller Karalunas, *Pennsylvania Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ............13

Lauren Miller Karalunas, *Wisconsin Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ............13

Adam Kuckuk, *For an Odd Year, 2025 Packs Big Elections*, Nat'l Conf. of State Legislatures (Sept. 23, 2025) ............10

David Landau, et al., *Federalism, Democracy, and the 2020 Election*, 99 Tex. L. Rev. Online 96 (2021) ............14

Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025) ............9

Pew Research Center, *On issue after issue, Americans say things are going better locally than nationally*, (Feb. 10, 2025)............11

*States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026) ............17

Wendy Weiser, *Michigan Election Inspectors: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ............13

## INTRODUCTION

Free and fair elections are the cornerstone of our constitutional system.[1] The right to vote is "'so essential for the preservation of all their other rights, that it ought to be considered as one of the most sacred parts of our constitution.'" *Powell v. McCormack*, 395 U.S. 486, 534 n.65 (1969) (quoting 16 Parl.Hist.Eng. 589–90 (1769)). Voting is a "fundamental political right," because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).[2]

The Constitution expressly delegates authority to the states to safeguard this right in the Elections Clause. *See* U.S. Const., art. I, § 4, cl. 1; *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013); *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972). The Clause is an "express delegation[ ] of power to the States to act with respect to federal elections," *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 805 (1995), and it provides states with

> authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. All parties to the appeal consented to the filing of this brief.

[2] Internal citations, quotation marks, and alterations are omitted from all case quotations unless otherwise noted.

> which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932). The authority conferred by the Elections Clause is of course "checked and balanced" by Congress, but it resides "primarily" with the states. *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019).

In the experience of Amici, bipartisan former governors from across the United States, states embrace this crucial role expressly assigned to them by the Constitution. The officials who work in the 10,000 election administration jurisdictions across the United States serve with honor and a sense of obligation to their communities and to the Constitution. In Amici's experience, state and local election officials, whatever their party, are dedicated, highly competent, responsible, accountable, and transparent. Even in the face of increasing threats and harassment stemming from election misinformation, state and local officials admirably discharge their duties and ensure that elections are free and fair. By design, this balanced and decentralized system serves not only as a bulwark against efforts to undermine democracy, but to foster confidence and trust among the voting public.

Amici respectfully submit that the United States Postal Service's new rule purporting to control mail-in balloting is unlawful and threatens to undermine the Constitution's careful separation of powers. *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 54,966 (Aug. 26, 2026) (the "USPS Rule"). The USPS Rule implements the President's March 2026 executive order seeking to regulate mail-in

voting procedures. *See* Exec. Order 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026). But the "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023). Indeed, "[t]he Constitution does not grant the President any specific powers over elections," and "no law enacted by Congress delegates authority to control mail-in voting to USPS." *State of California v. Trump*, No. 1:26-cv-11581, 2026 WL 1826490, at *3, *15 (D. Mass. June 25, 2026) *stayed on other grounds sub nom. Trump v. California*, 2026 WL 2473573 (U.S. Aug. 24, 2026). The USPS Rule therefore confers authority to the executive branch that the executive branch does not possess, at the expense of the states and Congress, simultaneously offending the core constitutional principles of federalism *and* the separation of powers. Far from "ensuring . . . integrity in federal elections," the USPS Rule undermines trust in elections, needlessly complicates mail-in voting processes, arbitrarily disenfranchises eligible mail-in voters, and undermines states' constitutional role in ensuring free and fair elections. State election officials across the country are working now to prepare for the upcoming midterm elections, and judicial relief is necessary to provide the certainty required to administer elections that are compliant with state and federal laws.

## INTEREST OF AMICI

Amici curiae are a bipartisan group of former governors who served as their states' chief executives and, in that capacity, were responsible for the administration of elections in their respective states. Several Amici also served as state election officials themselves, including four who served as Secretary of State prior to becoming Governor. In those roles, Amici exercised the substantial authority delegated to the states by the Elections Clause and ensured the integrity and efficiency of state and federal elections within their states.

The former governors represent diverse political affiliations, geographies, and tenures, yet are unified in their support for Appellees' request for relief in this case. Amici submit that the USPS Rule offends the Constitution's careful balance of state and federal authority, undermines state executives' ability to ensure free and fair elections within their states, and breaks with a long tradition of cooperation between Congress and the states concerning election administration. Amici in support of this brief are:

- Neil Abercrombie, Governor of Hawaii from 2010 to 2014.
- Jerry Brown, Governor of California from 1975 to 1983 and 2011 to 2019; Secretary of State of California from 1971 to 1975.
- Kate Brown, Governor of Oregon from 2015 to 2023; Secretary of State of Oregon from 2009 to 2015.

- Steve Bullock, Governor of Montana from 2013 to 2021.
- Arne Carlson, Governor of Minnesota from 1991 to 1999.
- Chet Culver, Governor of Iowa from 2007 to 2011; Secretary of State of Iowa from 1999 to 2007.
- Mark Dayton, Governor of Minnesota from 2011 to 2019.
- Parris Glendening, Governor of Maryland from 1995 to 2003.
- Jennifer Granholm, Governor of Michigan from 2003 to 2011.
- Bill Graves, Governor of Kansas from 1995 to 2003; Secretary of State of Kansas from 1987 to 1995.
- Christine Gregoire, Governor of Washington from 2005 to 2013.
- John Kitzhaber, Governor of Oregon from 1995 to 2003 and 2011 to 2015.
- Gary Locke, Governor of Washington from 1997 to 2005.
- Jack Markell, Governor of Delaware from 2009 to 2017.
- Terry McAuliffe, Governor of Virginia from 2014 to 2018.
- Martin O'Malley, Governor of Maryland from 2007 to 2015.
- Deval Patrick, Governor of Massachusetts from 2007 to 2015.
- Pat Quinn, Governor of Illinois from 2009 to 2015.
- Marc Racicot, Governor of Montana from 1993 to 2001.
- Kathleen Sebelius, Governor of Kansas from 2003 to 2009.

- Steve Sisolak, Governor of Nevada from 2019 to 2023.
- Eliot Spitzer, Governor of New York from 2007 to 2008.
- Tom Vilsack, Governor of Iowa from 1999 to 2007.
- Bill Weld, Governor of Massachusetts from 1991 to 1997.
- Christine Todd Whitman, Governor of New Jersey from 1994 to 2001.
- Tom Wolf, Governor of Pennsylvania from 2015 to 2023.

## ARGUMENT

Our system of constitutional federalism safeguards liberty. "[T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people." *Printz v. United States*, 521 U.S. 898, 919–20 (1997). This "healthy balance of power between the States and the Federal Government . . . reduce[s] the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). Federalism may on occasion be cumbersome, but the Founders understood that, through the dispersion of authority, "a double security arises to the rights of the people." The Federalist No. 51 (Alexander Hamilton).

This general principle applies with particular force in the context of elections. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other

rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968). Voting, and therefore free and fair elections, are "of the most fundamental significance under our constitutional structure." *Ill. State Bd. Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

## I. Our System of Electoral Federalism

The Constitution expressly delegates primary authority over elections to the states, subject to congressional—not federal executive—oversight. The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. Thus, "states have a unique and primary role in administering elections, including federal elections." *California v. Trump*, 183 F.4th 52, 70 (1st Cir. 2026).

The federal executive has no constitutional role in election administration beyond the enforcement of laws enacted by Congress pursuant to its Election Clause authority. *See Meadows*, 88 F.4th at 1346–47. Indeed, "executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025). The federal executive has no authority to interfere with, much less override, state authority to regulate elections. *See Colorado v. DeJoy*, No.

20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) (holding that the Postal Service, as an executive agency of the federal government, does not have authority to override state election laws).

Federal statutes enacted pursuant to Congress's authority under the Elections Clause respect this constitutional structure and preserve, rather than undermine, states' authority to administer elections. The National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.*, for example, together establish a "floor" for federal election administration standards, preserving state officials' discretion to determine appropriate implementation mechanisms that meet the needs of their state and citizenry.[3] In the NVRA and HAVA, Congress confirmed through law what Amici know from experience—that election administration requires the kind of flexibility

[3] *See, e.g.*, *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 317 (S.D.N.Y. 2020) (discussing *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 762 (2018), and explaining that "the NVRA sets the floor for how states conduct list maintenance; states have discretion to choose how precisely to follow its requirements," and "[s]tates take a variety of approaches in complying with the NVRA's requirements"); *Cnty. of Nassau v. New York*, 724 F. Supp. 2d 295, 298 (E.D.N.Y. 2010) (noting that relevant provisions in HAVA "set[] minimum requirements for federal elections," and that "[t]he specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.").

and local knowledge that state and local officials possess, and that federal officials do not.[4]

## II. Electoral Federalism Confers Substantial Benefits on our Nation and Citizenry

In Amici's experience, the default rule of state control established by the Elections Clause promotes and protects free and fair elections. Because the Constitution has delegated election authority to states since the Founding, states have developed deep practical and institutional expertise in managing the "extraordinarily complicated" task of running statewide elections. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of stay). The overwhelming majority of elections conducted in the United States every year are for state and local offices,[5] and many occur during odd numbered years, completely independent from

---

[4] *See* Mitch McConnell, *Trump Gives Democrats a Voting Gift,* Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's Elections."); *id.* ("[D]elegation of authority over election administration is crystal clear. Elections may have national consequences but the power to conduct them rests in state capitols.").

[5] *See, e.g.*, Jess Brouard, *States, Not the President, Run Elections in America*, State Court Report (Oct. 21, 2025), https://statecourtreport.org/our-work/analysis-opinion/states-not-president-run-elections-america (noting that 2026 midterm elections will be for "all 435 House seats, 33 Senate seats, and thousands of state legislature seats across the country").

even-year federal elections.[6] The actual work of running these elections is done by local officials in the more than 10,000 election administration jurisdictions across the country.[7]

This decentralized system "allows individual jurisdictions to experiment and innovate—to see how elections might best be run for the state and the locality's particular circumstances."[8] Elections require "enormous advance preparations by state and local officials, and pose significant logistical challenges" that state officials are uniquely qualified and situated to address. *Milligan*, 142 S. Ct. at 880. In Amici's experience, states admirably discharge their responsibility for establishing

---

[6] *See, e.g.*, Adam Kuckuk, *For an Odd Year, 2025 Packs Big Elections*, Nat'l Conf. of State Legislatures (Sept. 23, 2025), https://www.ncsl.org/state-legislatures-news/details/for-an-odd-year-2025-packs-big-elections (discussing 2025 state-level elections in Virginia and New Jersey, and 2027 elections in Kentucky, Louisiana, and Mississippi); Christopher R. Berry, *Democracy Reform Primer Series: The Timing of Local Elections*, U. Chicago (Jan. 25, 2024), https://effectivegov.uchicago.edu/primers/the-timing-of-local-elections ("Most local elections are held off-cycle, on separate days from higher profile state and federal elections."). It may be, as Prof. Berry notes, that holding local elections in odd-numbered years is a significant factor in low turnout for those elections, but that point does not undermine the broader point about local experience and expertise in running free and fair elections. *See, e.g.*, *id.* ("In Nassau County, New York, for example, local elections take place on 24 different dates scattered throughout 11 months of the calendar year; none of them coinciding with major state or federal elections in November.").

[7] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.

[8] *Id.*

"rules that dictate everything from the date on which voters will go to the polls to the dimensions and font of individual ballots." *Moore v. Harper*, 600 U.S. 1, 29 (2023). State officials exercise their discretion under the Elections Clause to make countless "difficult decisions about how best to structure and conduct elections" that reflect their respective state's varying needs and priorities. *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31–32 (2020) (Kavanaugh, J., concurring).

Amici submit that our system of electoral federalism also increases trust among the electorate. "State run elections mean that voters recognize their neighbors who staff polling stations, trust their Secretaries of State—whom they voted for—to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for." *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807, at *2 (C.D. Cal. Jan. 15, 2026). This is borne out in survey data, which demonstrates that Americans view their state and local officials far more positively than federal officials,[9] and that they have substantially more trust and confidence in state and local officials as compared

[9] *See* Pew Research Center, *On issue after issue, Americans say things are going better locally than nationally*, (Feb. 10, 2025), https://www.pewresearch.org/short-reads/2025/02/10/on-issue-after-issue-americans-say-things-are-going-better-locally-than-nationally/.

to federal officials.[10] In this era of rampant election misinformation, the authority exercised by the states under the Elections Clause serves as a bulwark against the further erosion of public confidence in our electoral system.

As both a cause and a consequence of these features, state and local election administration is also less partisan than the current national discussion about elections would suggest. Many states, including states in which Amici served as governors, have regulations that specifically address partisanship, and give both major political parties an equal role in ensuring the integrity of state-run elections. In Michigan, for example, election inspectors are employed by local county clerks, and each clerk must have at least one inspector from each major political party. And at voting locations, while voting is ongoing, many tasks must be completed by bipartisan pairs of election workers, including "assisting voters who request instruction after entering a voting station; opening any electronic tabulating equipment during the day to ensure its proper operation; sealing ballot containers, electronic devices, or any other election materials; and delivering documents and

---

[10] *See* Gallup, *Americans Trust Local Government Most, Congress Least* (Oct. 13, 2023), available at https://news.gallup.com/poll/512651/americans-trust-local-government-congress-least.aspx.

sealed ballots after the polls close."[11] Nevada,[12] Ohio,[13] Pennsylvania,[14] and Wisconsin,[15] to name just a few examples of states in which Amici have served as governors, have laws that similarly require bipartisan cooperation in election administration and monitoring.

[11] *See generally* Wendy Weiser, *Michigan Election Inspectors: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/michigan-election-inspectors-rules-and-constraints.

[12] *See generally* Lauren Miller Karalunas, *Nevada Election Board Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/nevada-election-board-officers-rules-and-constraints.

[13] *See generally* Lauren Miller Karalunas, *Ohio Precinct Election Officials: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/ohio-precinct-election-officials-rules-and-constraints.

[14] *See generally* Lauren Miller Karalunas, *Pennsylvania Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/pennsylvania-election-officers-rules-and-constraints.

[15] *See generally* Lauren Miller Karalunas, *Wisconsin Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/wisconsin-election-officials-rules-and-constraints.

Finally—and critically—"[t]he dispersed responsibility for running elections also makes it extremely difficult, if not impossible, to rig U.S. elections at the national level."[16] In the election context,

> states do not just serve as 'guard dogs' for any federal misbehavior or as governments that compete with the federal government for voter affection. Instead, states remain significantly functionally independent of, and resistant to capture by, the Executive Branch due to a uniquely American mix of tradition, doctrine, and resource constraints.[17]

This system is occasionally inefficient, but it makes the risk of partisan capture "far less likely" and acts as a "reasonably effective bulwark against efforts by an authoritarian president to make the overall electoral playing field unfair."[18]

Thanks to the Founders' forethought, the division of authority established by the Elections Clause continues to confer benefits on our nation, states, and citizenry. The primacy of state lawmaking and state lawmakers in this area "allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic

---

[16] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.

[17] David Landau, et al., *Federalism, Democracy, and the 2020 Election*, 99 Tex. L. Rev. Online 96, 100 (2021).

[18] *Id.* at 104.

processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S 787, 817 (2015). Amici respectfully submit that our system of electoral federalism is a cornerstone of our democracy and we—the courts, elected officials at all levels of government, and citizens—should zealously defend it.

### III. The USPS Rule Is Unlawful and Will Sow Confusion Among Election Officials and Voters

Against this backdrop, the USPS Rule is unlawful and unwise. It offends the basic constitutional principle that the federal executive has no role in the regulation of elections. *See* The Federalist No. 59 (Alexander Hamilton) (noting that the Constitution "submitted the regulation of elections for the federal government, in the first instance, to the local administrations" and only authorizes Congress "in the last resort" to further regulate federal elections); *Foster v. Love*, 522 U.S. 67, 69 (1997) (explaining that the Elections Clause "invests the States with responsibility for the mechanics of congressional elections" and only Congress has the authority to preempt state legislative choices); *Washington v. Trump*, 814 F. Supp. 3d 1173, 1214 n.57 (W.D. Wash. 2026) ("Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections."). And it undermines the very structure of our constitutional system.

"[F]ederalism and the separation of powers diffuse government authority to prevent the accumulation of excessive power in any one actor and to encourage different representatives of the people to monitor the exercises of power by the others." Jessica Bulman-Pozen, *Federalism as a Safeguard of the Separation of Powers*, 112 Columbia L. Rev. 459, 460 (2012). The USPS Rule is offensive to *both* of these core constitutional principles. It strips states of their explicit constitutional authority to regulate elections subject only to congressional—not federal executive—oversight, and, in displacing longstanding state authority over mail-in balloting, it will cause confusion among voters and election administrators alike, risking widespread arbitrary disenfranchisement of eligible voters. If the USPS Rule is permitted to stand, it will increase the authority of the federal executive at the expense of the states, Congress, and the constitutional order that has maintained our electoral democracy for 250 years.

The USPS Rule purports to transfer authority over mail-in voting from the states to the federal government in direct contravention of our constitutional structure governing elections. It undermines the right to vote of citizens who vote by mail by directing the USPS—which has no statutory authority, nor any expertise, regarding election administration—to gatekeep which voters may receive a mail-in ballot. *See* 91 Fed. Reg. at 54,991. The USPS Rule places burdensome conditions on states' use of the postal service to transmit mail-in ballots to voters, including by

requiring states to obtain USPS sign-off on ballot envelope design and by forcing state and local election officials to upload and certify voter information through a USPS database. *See* 91 Fed. Reg. at 54,985 (the USPS Rule "requires … that states that choose to use the U.S. mail as part of their elections adhere to certain standard mailpiece design and data reporting standards when sending Federal Ballot Mail."). And if a state is unwilling or unable to upload and certify the voter information USPS demands, the Rule provides that the state's "outbound mail-in ballots may be rejected from the mailstream as a consequence of noncompliance with the rule's requirements." *Id*. at 54,973-74.

The USPS Rule will impact an enormous number of eligible voters nationwide. Most states permit no-excuse absentee voting by mail and those that do not either conduct all elections by mail or permit qualified voters to vote by absentee ballot.[19] Mail-in and absentee voting ensure that citizens living abroad (including members of the military stationed outside the United States), those who are disabled, or those who know they will be traveling at the time of an election, are able to exercise their fundamental right.

---

[19] *States with No-Excuse Absentee Voting*, Nat'l Conf. of State Legislatures (Mar. 10, 2026), https://www.ncsl.org/elections-and-campaigns/table-1-states-with-no-excuse-absentee-voting.

Most states also allow eligible voters to request mail-in ballots shortly before Election Day. These longer timeframes to apply for mail-in ballots provide voters flexibility if their schedules change and no longer allow for them to vote in person. By way of example, Massachusetts allows voters to request absentee ballots up until five days before Election Day, *see* Mass. Gen. Laws ch. 54, § 89; Texas allows voters to apply for mail-in ballots up to 11 days before an election, *see* Tex. Elec. Code § 84.007(c); and Montana allows voters to request an absentee ballot as late as the day preceding Election Day, *see* Mont. Code Ann. § 13-13-211(1).

But the USPS Rule, implemented little more than two months before Election Day, runs roughshod over these carefully crafted state statutes and will invariably create chaos for voters and election officials alike. It forces states to design new mail ballots, seek USPS approval of new designs, update their election management systems, and upload sensitive voter data to an untested USPS database, all before the rapidly approaching midterm elections. Importantly, the USPS Rule does not include a deadline or turn-around time for USPS to approve mail-in ballots it receives for delivery—thus making local election administrators and mail-in voters entirely reliant on the USPS's timely review and approval of mail-in voter data it receives from the states.[20] It is exceedingly unclear whether USPS—an agency with

[20] *Disclosure Letter to Senator Blumenthal re: USPS Rushed Implementation of New and Untested IT Systems Threatens U.S. Ballot Mail Delivery* at 10–11 (Aug. 29, 2026), available at https://www.blumenthal.senate.gov/imo/media/doc/2026-8-

zero election administration experience—will be able to timely approve mail-in ballots requested by eligible voters in the days leading up to Election Day. Amici believe that these onerous and unnecessary processes will inevitably disenfranchise large swaths of voters who would otherwise be entitled to receive a mail-in ballot under state law, and will create confusion among voters and election officials attempting to navigate conflicting federal and state laws.

The USPS Rule thus improperly recruits USPS into making substantive judgments about who may vote using a mail-in ballot and how they must do so, displacing state and local election officials who have the constitutional authority—and the necessary experience—to regulate mail-in balloting procedures. The USPS Rule purports to authorize USPS to decline delivery of otherwise deliverable mail-in ballots merely because the voter does not appear on the USPS list, without regard for whether the voter is *in fact* eligible to vote, in direct violation of the agency's longstanding statutory universal service obligation. *See* 91 Fed. Reg. at 54,991 ("Mailings that do not comply with [the USPS Rule] will not be accepted and will be returned to the authorized ballot mailer"); 39 U.S.C. § 403(c). The USPS Rule's

31_usps_whistleblower_letter_final_with_disclosure.pdf ("The new scanning verification process is designed so that after a single failed bar code verification, USPS will stop the sample scanning and refuse to accept the entire batch of ballots. . . . As designed, the process is entirely unforgiving. It could delay ballots by the thousands in repeated verification cycles - and thus prevent states from mailing enormous numbers of ballots.").

delegation of authority to USPS to regulate mail-in balloting not only violates basic principles of federalism, *see Cook v. Gralike*, 531 U.S. 510, 523 (2001) (Elections Clause grants states "broad power to prescribe the procedural mechanisms for holding congressional elections"), it also risks disenfranchising the significant number of voters who rely on mail-in balloting to exercise their fundamental right to vote. In order to vindicate the federalism interests underlying our electoral system against these sweeping and unlawful last-minute changes to states' established mail-in voting practices, amici therefore submit the Court should enjoin the USPS Rule. By blocking late-breaking federal changes to states' democratically enacted mail balloting practices, such an injunction "not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez*, 549 U. S. 1, 4–5 (2006); *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181, 197 (2008) (plurality opinion)).

**CONCLUSION**

For the reasons set forth above, Amici respectfully assert that the USPS Rule is unconstitutional and should be enjoined.

DATED: September 1, 2026

*<u>/s/ Carey R. Dunne</u>*
Carey R. Dunne
*Counsel of Record*
Kevin Trowel
Mónica Folch
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018

Julia Spiegel
Emily Kirby
Charanya Krishnaswami
Megan Flynn
GOVERNORS ACTION ALLIANCE
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

Andrew J. Rising
Carlos Guevara
GOVERNORS SAFEGUARDING DEMOCRACY
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

*Counsel for Bipartisan Former Governors*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and type-volume requirements of Federal Rule of Appellate Procedure 32. The brief contains 4,513 words and was prepared with 14-point proportionally spaced serif typeface using Microsoft Word.

DATED: September 1, 2026

*/s/ Carey R. Dunne*
Carey R. Dunne

## CERTIFICATE OF SERVICE

I certify that on September 1, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

DATED: September 1, 2026

*/s/ Carey R. Dunne*
Carey R. Dunne