**Nos. 26-1988, 26-1989**

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

---

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, LEAGUE OF WOMEN VOTERS LOTTE E. SCHARFMAN MEMORIAL EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEAGUE OF WOMEN VOTERS EDUCATION FUND, ASSOCIATION OF AMERICANS RESIDENT OVERSEAS, U.S. VOTE FOUNDATION, OCA-ASIAN PACIFIC AMERICAN ADVOCATES, DELTA SIGMA THETA SORORITY, INC.,
*Plaintiff-Appellees*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, UNITED STATES POSTAL SERVICE, UNITED STATES POSTAL SERVICE BOARD OF GOVERNORS, DAVID STEINER, in his official capacity as Postmaster General, DOUGLAS A. TULINO, in his official capacity as Deputy Postmaster General, AMBER F. MCREYNOLDS, in her official capacity as Chairwoman of the Board of Governors of the United States Postal Service, DEREK T. KAN, in his official capacity as the Vice Chairman of the Board of Governors of the United States Postal Service, RONALD A. STROMAN, in his official capacity as a member of the Board of Governors of the United States Postal Service, DANIEL M. TANGHERLINI, in his official capacity as a member of the Board of Governors of the United States Postal Service,
*Defendant-Appellants*,

STATE OF MISSOURI; STATE OF ALABAMA; STATE OF FLORIDA; STATE OF INDIANA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF TEXAS,
*Intervenor Defendant-Appellants*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

**PLAINTIFF-APPELLEES' COMBINED OPPOSITION TO DEFENDANT-APPELLANTS' MOTIONS FOR STAY PENDING APPEAL**


Jessie J. Rossman
Suzanne Schlossberg
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108

Eliza Sweren-Becker
Wendy Weiser
Andrew B. Garber
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Justin Lam
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001

Niyati Shah
Noah Baron
Ejaz Baluch, Jr.
ASIAN AMERICANS ADVANCING JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036

Miranda Galindo

Sophia Lin Lakin
Theresa J. Lee
Davin Rosborough
Ethan Herenstein
Jonathan Topaz
Ming Cheung
William Hughes
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Sarah Brannon
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

Leah C. Aden
Brenda Wright
John S. Cusick
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005

Latino Justice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115

*Counsel for Plaintiff-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellees League Of Women Voters Of Massachusetts, League Of Women Voters Lotte E. Scharfman Memorial Education Fund, League Of Women Voters Of The United States, League Of Women Voters Education Fund, Association Of Americans Resident Overseas, U.S. Vote Foundation, OCA-Asian Pacific American Advocates, and Delta Sigma Theta Sorority, Inc. state that they have no parent corporation and no publicly held corporation owns 10% or more of their stock.

## TABLE OF CONTENTS


INTRODUCTION ....... 1

STATEMENT ....... 3

A. State and Congressional Authority Over Mail Voting ....... 3

B. Congress's Postal Clause Authority and USPS's Independent Functions . 4

C. The Unlawful Executive Order and USPS's Final Rule ....... 5

D. The Properly Tailored TRO ....... 6

ARGUMENT ....... 7

I. DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS ....... 7

A. This Court Lacks Appellate Jurisdiction ....... 7

B. Defendants are Unlikely to Succeed on the Merits ....... 13

II. THE REMAINING STAY FACTORS WEIGH AGAINST A STAY ....... 22

A. Defendants Have Not Shown Irreparable Harm from a Narrow TRO Where the Preliminary Injunction Hearing is in Less Than Two Days .. 22

B. The Equities and Public Interest Strongly Counsel Against a Stay ....... 24

III. THE SCOPE OF RELIEF IS PROPER ....... 27

CONCLUSION ....... 28

## INTRODUCTION

Only the states and Congress—not the President or the U.S. Postal Service (USPS)—have authority over election administration. And Congress has not delegated any authority to the President or USPS to intervene in election administration policies. Yet, at the President's direction, *see* Executive Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, 91 Fed. Reg. 17125 (Mar. 31, 2026) (Executive Order or Order), USPS enacted a final rule regulating mail ballots that coerces states to provide data for each citizen who intends to vote via mail ballot and grants itself the authority to reject and return every ballot sent by states to their citizens based on alleged noncompliance with the Rule. *See Ballot Mail for Federal Elections*, 91 Fed. Reg. 54966 (Aug. 26, 2026) (Final Rule or Rule).

The district court appropriately issued a properly tailored, temporary restraining order (TRO) against parts of the Rule to prohibit USPS from unlawfully rejecting ballot mail while it considers Plaintiffs' preliminary-injunction motion, which is *fully briefed* and scheduled for a hearing *the day after tomorrow*. USPS and Intervenor States (collectively, Defendants) nonetheless seek a stay of the TRO pending appeal—a request this Court lacks jurisdiction to consider. A TRO is not appealable where, as here, it is set to expire within 14 days and was issued before a hearing. Defendants' request is particularly unwarranted because they *rejected* a

proposal for a faster preliminary-injunction schedule. Having declined that opportunity to obtain even faster resolution in the district court, Defendants cannot now claim that immediate appellate intervention is needed to prevent irreparable harm.

Regardless, Defendants have not made a strong showing that they are likely to succeed on appeal. Congress has not delegated any authority over election administration to USPS, and the Rule cannot be construed as anything but interference with the mechanics of each state's voting system. Nor can USPS rely on its general rulemaking authority to create new categories of nonmailable materials absent congressional authorization.

Nor have Defendants shown that waiting a mere few days for a preliminary-injunction ruling will cause them irreparable harm. By contrast, Plaintiffs, their members, and the public will face the irreparable harm of placing millions of Americans' ability to vote in November at imminent risk and impairing the core missions of Plaintiff voter-service organizations.

According to a newly disclosed whistleblower report submitted to the U.S. Senate, the new USPS systems implementing the Rule face potential "catastrophic failure," due to "rushed implementation, unclear requirements, and no meaningful testing." Anonymous Whistleblower Disclosure to Senator Richard Blumenthal at

4, 7 (August 30, 2026) (Whistleblower Rep.).[1] What is more, USPS's ballot-verification process will reject batches of ballots in their entirety if even a single barcode fails to properly scan, threatening to "delay ballots by the thousands in repeated verification cycles" and preventing "states from mailing enormous numbers of ballots." *Id.* at 1-2, 10-11; *see* 91 Fed. Reg. at 54991 (§§705.24.4.2(d), 705.24.5.1, 705.24.5.3).

This Court should deny Defendants' Motions.

## STATEMENT

### A. State and Congressional Authority Over Mail Voting

Authority to regulate federal elections rests with the states and Congress—not the President or a federal agency exercising authority Congress never granted it. *E.g.*, *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013). States exercise this power in the first instance, subject to potential congressional intervention as to the time, place, and manner of federal elections, *see* U.S. Const. art. I, §4, cl. 1, and Congress may legislate to enforce voting-related amendments, *see, e.g.*, U.S. Const. amend. XIV.

[1] Letter from David Kligerman to Richard Blumenthal (Aug. 30, 2026), https://www.blumenthal.senate.gov/imo/media/doc/2026-08-31_final_letter-disclosure.pdf [https://perma.cc/4D8N-9CCF].

### B. Congress's Postal Clause Authority and USPS's Independent Functions

The Constitution grants Congress—not the President—the power to "establish Post Offices and post Roads," U.S. Const. art. I, §8, cl. 7. Congress has exercised that power by "establish[ing] a detailed statutory and regulatory scheme to govern this country's vast postal system," *USPS v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 122 (1981). Congress most recently restructured the Postal Service through the Postal Reorganization Act of 1970 (PRA), 39 U.S.C. §101 *et seq. See USPS v. Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 739 (2004). The PRA "marked a dramatic break with the past." *Mail Ord. Ass'n of Am. v. USPS*, 986 F.2d 509, 512 (D.C. Cir. 1993). It created USPS as "an independent establishment of the executive branch," 39 U.S.C. §201, which must "be operated as a basic and fundamental service provided to the people," providing services "in all areas and . . . to all communities," *id*. §101(a).

Congress directed USPS to "serve as nearly as practicable the entire population of the United States" and not to engage in "undue or unreasonable discrimination among users of the mails." *Id.* §403(a), (c). USPS is empowered to enact rules and regulations when "necessary" to carry out its statutorily assigned "functions," to the extent "not inconsistent with this title," *id.* §401(2), and may take actions that are "necessary" or "appropriate" for carrying out its statutorily specified "functions" and "powers," *id.* §401(10). USPS has certain "specific powers"

pertaining to delivering mail, *id.* §404(a), subject to a statutorily-defined list of "nonmailable matter[s]," *id.* §§3001-3018. Postal agents may investigate criminal offenses by taking specified actions, such as serving warrants and making arrests. 18 U.S.C. §3061. None of USPS's functions, powers, or authorities contemplates the ability to impose requirements for how states administer their electoral processes or to reject ballot mail based on criteria Congress never legislated.

### C. The Unlawful Executive Order and USPS's Final Rule

Section 3 of the Executive Order directs the Postmaster General "to initiate a proposed rulemaking pursuant to 39 U.S.C. [§] 401 and other applicable authority within 60 days of the date of this order," Order §3(b), and details requirements that the rule "shall include, at minimum." *Id*.

On August 21, 2026, USPS issued the Final Rule, amending the Domestic Mail Manual "regarding the transmission of mail-in or absentee ballots for federal elections." 91 Fed. Reg. at 54966. As the Order directs, USPS, under the Rule, will not deliver mail ballots to voters unless: (1) the ballot envelope meets USPS's new design standards, which local election officials submit to USPS for approval; (2) the voter is on a state-specific "Mail-In and Absentee Participation List," which local election officials must create and transmit (through a new Federal Mail Ballot Portal; and (3) the voter's address, unique barcode, and originating state is the same on the ballot envelope and in the portal. 91 Fed. Reg. at 54991 (§§705.24.3, 705.24.5). At

the time of mailing, USPS "will review" each batch of ballots to determine whether it meets these criteria. *Id.* Under the ballot mail verification process, any batch that is found to have a single ballot that fails to properly scan will be rejected. 91 Fed. Reg. at 54991 (§§705.24.4.2(d), 705.24.5.1, 705.24.5.3).; Whistleblower Rep. at 10-11.

Absent judicial relief, the Rule will govern this November's elections, with mail and absentee voting beginning this month.

### D. The Properly Tailored TRO

On August 26, 2026, the day the Final Rule was published in the Federal Register, Plaintiffs filed a Supplemental Complaint adding three counts challenging the Final Rule and an emergency motion for a TRO and a preliminary injunction, ECFs 205, 206.

The next day, the district court issued a TRO enjoining the Rule, in part, for 14 days, with a preliminary injunction hearing seven days later. ECF 218 at 10-11; ECF 212 at 2. Under the TRO, the Rule's requirements that states enroll voters with USPS and conform ballot envelopes to USPS specifications are not mandatory, but states may choose to opt in (to the extent consistent with state law and any other legal requirements). *Id.*

The TRO also enjoins the requirement that nonconforming ballot mail be rejected, ensuring that all states may continue to utilize the Postal Service to deliver

ballots to voters as they have for decades. *Id.* (enjoining, in part, DMM §705.24.5.2 and all of §705.24.5.3(a)-(c)). The district court denied Defendants' and Intervenors' motions to stay the TRO pending appeal on August 31, 2026. ECF 242.

## ARGUMENT

The "extraordinary" relief of a stay pending appeal represents an "intrusion into the ordinary processes of administration and judicial review." *Rhode Island v. Trump*, 155 F.4th 35, 41 (1st Cir. 2025) (quoting *New York v. Trump*, 133 F.4th 51, 65 (1st Cir. 2025)). Defendants cannot carry their burden as to any of the four factors required for a stay, nor have they shown the need for an administrative stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). That is especially so because this Court lacks jurisdiction to consider their TRO appeal.

### I. DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Defendants bear the appellate burden of proving that the TRO constitutes an abuse of discretion. *See Woonasquatucket River Watershed Council v. USDA*, --- F.4th ----, No. 25-1428, 2026 WL 2279789, at *7 (1st Cir. Aug. 7, 2026). Legal questions are reviewed de novo and factual findings for clear error. *Id*.

#### A. This Court Lacks Appellate Jurisdiction.

Defendants cannot show likely success on appeal because the TRO itself is not appealable, much less the denial of a motion to stay the TRO pending appeal. "Courts of Appeals generally lack appellate jurisdiction over appeals from TROs."

*Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025); *see also Almeida-León v. WM Cap. Mgmt., Inc.*, No. 20-2089, 2024 WL 2904077, at *4 (1st Cir. June 10, 2024). USPS (8-12) and Intervenors (9-11) invoke the narrow exception for orders that, despite their label, function as preliminary injunctions. But this order has the defining features of a TRO.

This Court looks "primarily to the order's duration" in distinguishing TROs from preliminary injunctions. *Almeida-León*, 2024 WL 2904077, at *4. Here, the TRO lasts only the 14 days permitted by Federal Rule of Civil Procedure 65(b)(2), and the district court scheduled a preliminary-injunction hearing for two days from now, a full week before the TRO expires. That is materially indistinguishable from *D.V.D. v. DHS*, No. 25-1311, 2025 WL 1029774 (1st Cir. Apr. 7, 2025), where this Court held a TRO unappealable because the district court had scheduled a preliminary-injunction hearing within the 14-day period. *Id.* at *1. Such scheduling, this Court explained, "reinforces the temporary nature of the relief at issue." *Id.* The same is true here.[2]

Nor does the TRO have the "hallmarks of a preliminary injunction" identified in the rare cases finding appealability. *Dep't of Educ.*, 604 U.S. at 651.

[2] USPS's suggestion (9-10) that the TRO alters the status quo is unfounded. Defendants argued below that Plaintiffs' challenge would ripen only upon the Final Rule's issuance, and Plaintiffs filed their motion the day the Rule published.

First, in *Department of Education*, the basis for the TRO was "strongly challenged" because the government was likely to prevail on its argument that the district court lacked jurisdiction. *Id.* Here, by contrast, USPS repeatedly represented that the district court would *only* have jurisdiction to consider Plaintiffs' challenge after USPS promulgated the Final Rule. *See* ECF 183 at 1-2; ECF 197 at 16-17. The Supreme Court likewise recognized that the states could challenge the Final Rule once issued. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026). Defendants thus cannot show that the TRO's jurisdictional basis is likely to fail, nor have Defendants identified a substantial merits argument establishing that USPS has any lawful authority to impose the Rule. *See infra* Part I.B.

Second, *Sampson v. Murray*, 415 U.S. 61 (1974), involved a TRO of "potentially unlimited" duration, entered after "an adversary hearing ha[d] been held," making the order resemble a preliminary injunction in substance. *Id.* at 86-87 & n.58 (noting the "most important" of TRO's "protective provisions is the limitation" on its duration)). As described, the 14-day TRO here does not extend beyond Rule 65's temporal limits, and full adversarial consideration is scheduled for 7 days after its entry. ECF 212 at 2.

Third, Defendants cannot credibly show that the TRO threatens "serious and perhaps irreparable harm." *Abbott v. Perez*, 585 U.S. 579, 595 (2018) (cited in *Dep't of Educ.*, 604 U.S. at 651). USPS (8-11) and Intervenors (26-27) contend the TRO

imposes irrevocable harm because ballot mailing will begin while it is in effect. But as USPS admits, the TRO allows USPS to implement envelope design and portal participation for any state that voluntarily participates. *See* ECF 227 at 2. Only its bar on USPS rejecting Rule-noncompliant election mail applies in every state. *See id.* Yet Defendants identify at most two states that *may* begin mailing ballots before the TRO dissolves, one of which (North Carolina) is *actively seeking* a preliminary injunction, and the other (Alabama), according to USPS (9), is not required to begin mailing ballots until *six days after* the preliminary injunction hearing. Nothing about the TRO prevents these states from mailing ballots in compliance with their state laws, and it is unclear how states are harmed by *not* having their mailings rejected by USPS. Nor, as a basis for the Rule, is there any record evidence of "fraudulent absentee or mail-in voting," let alone evidence that USPS's review of election mail under the Rule would address this "unsubstantiated problem." ECF 218 at 10.

Defendants' representations and choices further undermine any claim that a TRO appeal is needed to avoid any claimed harm. In opposing Plaintiffs' requested injunctive relief—first sought nearly five months ago—USPS repeatedly assured the district court that once the Final Rule issued, "it can be litigated, if necessary, on an expedited basis," June 2, 2026 Hr'g Tr: 18:18-23, ECF 155, that "[i]t would only take a very short amount of time for a [TRO] or a preliminary injunction to [be] issue[d]," Aug. 7, 2026 Hr'g Tr: 16:14-21, Dkt. 181, and "courts could act even more

expeditiously if needed," *Id.* 66:19-21. USPS recommended such action despite its awareness of "the practical problems that arise from that sort of litigation." June 2, 2026 Hr'g Tr: 17:23-18:1. And USPS opposed Plaintiff States' even more aggressive schedule for their current preliminary-injunction motions. *California v. Trump*, 26-cv-13917, (D. Mass. Aug. 26, 2026), Dkt. 3 at 3, 10. USPS cannot now maintain that the process is too slow while it opposes its acceleration. These circumstances belie any contention that the TRO can "only be effectually challenged by means of an immediate appeal." *Calvary Chapel of Bangor v. Mills*, 984 F.3d 21, 27 (1st Cir. 2020).[3]

USPS's remaining authority (8-9) is no more persuasive. *Northeast Ohio Coalition for the Homeless, Local 1199 v. Blackwell*, unlike here, involved a TRO requiring officials to take irreversible steps: telling voters they need not comply with voter-identification requirements, where ballots cast without that identification could not later be subjected to those requirements. 467 F.3d 999, 1006 (6th Cir. 2006). The resulting harm was, by definition, "irretrievable." *Id.* Here, by contrast,

[3] Plaintiffs' irreparable harm *absent* a TRO further distinguishes *Department of Education*. There, the respondents had "represented . . . that they ha[d] the financial wherewithal to keep their programs running" during the litigation and could recover withheld funds if they prevailed. *See Dep't of Educ.*, 604 U.S. at 652. Here, Plaintiffs have demonstrated the harms the TRO prevents cannot be remedied after the fact. *E.g.*, ECF 218 at 10.

the TRO mandates no irreversible action; it just pauses the Rule's implementation while the district court quickly considers preliminary relief.

*Rhode Island State Council of Churches v. Rollins*, is likewise distinguishable because the parties there did not dispute that the orders functioned as preliminary injunctions, they required the immediate disbursement of billions of dollars, and they were issued "after adversarial briefing and a hearing." 158 F.4th 304, 311 (1st Cir. 2025). None of these features is present here.

Lastly, the election's proximity does not change the result. Intervenors argue that immediate review is warranted because, "[w]hen an election is close at hand, the rules of the road must be clear and settled." Intvrs. 9 (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring in grant of stay)). But that principle does not expand appellate jurisdiction over TROs. And the TRO does not impose new election rules on the eve of an election; instead, it *prevents* USPS from implementing a new rule while the district court considers preliminary relief on an expedited schedule. States wishing to do so may still voluntarily participate in the Rule's envelope-review and portal processes. ECF 227. Nor would a stay provide greater certainty for this year's elections because ultimate resolution hinges on the preliminary injunction. For months, Defendants have rebuffed Plaintiffs' repeated efforts to adjudicate the merits of this case at an earlier date and assured the district court that such adjudication would be possible whenever the Final Rule issued. They

cannot now point to the election's proximity as a reason to treat this conventional 14-day TRO as an appealable preliminary injunction.

**B. Defendants are Unlikely to Succeed on the Merits.**

Defendants have not made the requisite "strong showing" that the district court erred in ruling that Plaintiffs likely have standing and the Final Rule likely is ultra vires and unconstitutional. *Nken*, 556 U.S. at 426 (citation omitted).

**1. Plaintiffs Have Standing.**

The district court correctly held that Plaintiffs have standing because the Final Rule directly harms both their members and their core voter-engagement activities. ECF 218 at 8.

First, the Rule will prevent Plaintiffs' members from casting mail ballots. Plaintiffs' millions of members span every state and include voters who need to vote by mail and are now risk being unable to vote at all. *See* 3d Stewart Decl. ¶¶3, 11, 36, 39, ECF 208-1; 3d Speer Decl. ¶¶9, 12, 35, ECF 208-2; 3d Nguyen Decl. ¶¶3-7, 13, 17, 33-36, 47, ECF 208-3; 3d Canavan Decl. ¶¶24-25, 58, 59(a)-(c), ECF 208-4; 3d Washington Decl. ¶¶12-13, 31-34, ECF 208-5. Intervenors' claim (12) that this harm is speculative because they intend to comply with the Rule misses the point: Plaintiffs' members live in jurisdictions that may not—or cannot—comply. And even jurisdictions attempting to comply face a substantial risk that thousands of ballots will be rejected from the Rule's rushed implementation and a zero-tolerance

verification regime, under which a single envelope that fails to properly scan will cause an entire batch to be rejected. Whistleblower Rep. at 10.

Second, the Rule directly impairs Plaintiffs' core voter-engagement activities. The Rule causes "substantial confusion among [Plaintiffs'] members," whom Plaintiffs are trying to educate about their voting rights. ECF 218 at 7. Contrary to USPS's (12-13) and Intervenors' (11-12) assertions, that is a concrete organizational injury, not an abstract grievance. Courts routinely recognize standing where government action directly interferes with an organization's voter-education and voter-engagement work. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). The fact that the Rule produces that interference through confusion and chaos does not make the resulting impairment of the organizations' mission any less concrete. *See, e.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 397 (4th Cir. 2024) (state action that inhibited committee's ability to "counsel voters" conferred standing because it affected and interfered with organizational mission); *Coal. for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28, 42 (D.N.H. 2025).

**2. The Rule is Unlawful.**

To start, the Final Rule is ultra vires because it exceeds USPS's statutorily assigned functions and affirmatively violates several of USPS's governing statutes.

Congress never authorized USPS to exercise the mail-ballot gatekeeping role that it assigned itself. USPS (14-17) and Intervenors (14-18) rely on USPS's broad authority over the mails, including its authority to execute its statutorily assigned functions, such as to "collect[], handl[e], [and] transport[]," mail, among others, and investigate "postal offenses." 39 U.S.C. §§401(2); 404(a)(1), (6). USPS contends (16) these provisions give it the power to impose "envelope design and labeling" requirements. But the Rule does far more than regulate envelope labeling: It conditions acceptance of mail ballots on states' submission of voter information and USPS verification of the intended recipient against that information. Likewise, USPS's investigative authority over postal offenses permits only specified statutory actions based on individualized suspicion, such as serving warrants and making arrests, 18 U.S.C. §3061—not rejecting ballot mail under criteria that Congress never enacted. Indeed, the Supreme Court has long been clear that "[the] right to exclude letters, or to refuse to permit their delivery to persons addressed, must depend upon some law of Congress." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109 (1902). Nothing, however, assigns USPS the power to reject ballot mail.

Congress has exhaustively identified categories of nonmailable matter in 39 U.S.C. §§3001-3018; mail ballots noncompliant with the Rule's regulations are not on that list. USPS (14-19) and Intervenors (14-18) invoke USPS's authority to

regulate particular categories of mail but their examples turn on characteristics of the mail piece, and—in contrast to the Rule—are tethered to specific congressional authorizations.

USPS relies (18-19) on its authority to prevent certain types of fraud to "obtain[] money or property" or solicitation for "goods or services" but Congress specifically conferred authority to restrict such mailings. *See* 39 U.S.C. §§3005, 3001(d)(2). Rules governing cremated remains and replica explosives address postal handling concerns and likewise rest on Congress's express regulation of hazardous matter. 18 U.S.C. §1716(a)-(b); *see* New Standards Prohibit the Mailing of Replica or Inert Munitions, 73 Fed. Reg. 12321-01 (Mar. 7, 2008). USPS itself recognized that "ballot mail does not present . . . the same operational issues." 91 Fed. Reg. at 54974. Defendants' cited cases offer no further support for their arguments. *USPS v. Council of Greenburgh Civic Associations*, 453 U.S. 114 (1981), concerned a statute restricting unstamped matter placed in mailboxes; and *Associated Third Class Mail Users v. USPS*, 600 F.2d 824 (D.C. Cir. 1979), concerned implementation of a statute governing "letters and packets." Here, the Rule is driven by supposed "election integrity," 91 Fed. Reg. at 54966, not "postal integrity," and conditions ballot acceptance on states providing voter-specific information that exactly matches each ballot. *McAnnulty* requires congressional authority for USPS's actions. USPS cites none.

Defendants offer two unpersuasive theories why the Rule falls within USPS's authority.

First, USPS (2, 16-17) and Intervenors (17-21) claim the Rule does not create a new category of non-mailable matter. USPS argues (2) it is simply placing certain "conditions on acceptance" for federal ballot mailings, and Intervenors suggest (17, 21) that it is similar to requiring "a postage stamp." But Congress authorized USPS to prescribe "the amount of postage and the manner in which it is to be paid." 39 U.S.C. §404(a)(2); *see also id.* §404(b) (authorizing USPS to establish classes of mail; rates of postage and fees). Congress has also specified that matter exceeding applicable size and weight limits for a class of mail is nonmailable. *Id.* §3001(c)(1). By contrast, Congress never authorized USPS to condition acceptance of ballot mail on the submission of voter-specific information or compliance with election-specific envelope designs.

Nor may USPS use its general rulemaking authority to create new categories of nonmailable matter beyond those specified in 39 U.S.C. §§3001-3018. The Supreme Court rejects such unbounded executive action "[a]gainst [a] backdrop of clear and limited delegations," particularly where "the purported delegation involves" a "core congressional power"—such as postal and federal-election regulation. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 243-44 (2026). And the Rule

never claimed authority to create new categories of nonmailable matter, so USPS cannot invoke that rationale now. *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).

Hornbook statutory-interpretation principles make clear that USPS may not create new categories of nonmailable matter. Reading USPS's general rulemaking authority to permit it to create new categories of nonmailable material would contradict the canon that "the specific governs the general" by creating "the superfluity of a specific provision that is swallowed by the general [rule]." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citations omitted). The negative-implication canon points in the same direction. Congress enacted an "established series" of provisions identifying nonmailable matter, and that structure "necessarily bespeaks a negative implication" as to categories Congress omitted. *Esteras v. United States*, 606 U.S. 185, 195 (2025) (internal quotation marks omitted).

Second, USPS suggests (18-19) that the Rule resembles other "election-mail-specific rules," pointing to the "Kit 600 [Rule]" on election mail prioritization. But that rule is *optional*, merely offering nonbinding guidance for election mail. *See* 91 Fed. Reg. at 54991 (§§705.24.5.3). The Rule here is *mandatory* for any state that sends election mail. It thus differs materially from USPS's prior actions on election mail, like "non-binding" guidance recommending election-mail logos, tracking technology, and envelope designs compatible with sorting equipment. ECF 183 at 3.

The Rule also affirmatively violates statutory limits on USPS's delegated power. Congress charged USPS with the duty to "serve as nearly as practicable the entire population of the United States," 39 U.S.C. §403(a), but under the Rule, ballots that fail USPS's list-verification regime "will not be accepted" at all. 91 Fed. Reg. at 54991 (§705.24.5.3(a)). The Rule thus conditions an essential postal service function on compliance with a voter-verification regime that Congress never authorized USPS to administer. *See* ECF 183 at 4 ("USPS retains the obligation to provide universal service to all parts of the country.").

The Rule is also unconstitutional. "Congress—not the President [or his delegates]—is the check on States' authority to regulate federal elections." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 194 (D.D.C. 2025). USPS does not argue that the Executive may regulate elections beyond authority Congress delegated. Instead, it contends (17) that the Rule "does not regulate elections," just the mail. That characterization cannot be reconciled with the Rule's substance or the stated objectives of the Executive Order.

First, USPS claims (17) that the Rule "regulates only how States must design and label the envelopes"—ignoring the Rule's voter-specific enrollment requirement and mandatory rejection of noncompliant ballots. The Rule requires USPS to reject mail ballots unless the voters they are addressed to are enrolled with USPS "on the state's Mail-In and Absentee Participation List, consistent with the

technical specifications for the Federal Ballot Mail Portal." 91 Fed. Reg. at 54991 (§705.24.5.1). "Mailings that do not comply with [§] 24.5.1 and [§] 24.5.2 *will not be accepted* and *will be returned* to the authorized ballot mailer." *Id.* §705.24.5.3(a) (emphasis added). USPS is not merely regulating mail; it is acting as a nationwide election administrator, requiring jurisdictions to provide detailed information about each mail voter or forgo USPS sending mail ballots altogether.

USPS nevertheless repeatedly labels the Rule a "modest" regulation of "U.S. mail" (1-2, 4, 12, 14). But "it is the substance of what the [agency] has purported to do and has done which is decisive." *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942). Here, the Rule's substance confirms that USPS is engaged in election administration. The Rule expressly invokes the Executive Order and "the need . . . [to] help protect the integrity of federal elections." 91 Fed. Reg. at 54966. The Order, which is entitled "Ensuring Citizenship Verification and Integrity in Federal Elections," likewise states its purpose as "enhanc[ing] election integrity via the United States Mail." ECF 75-1. And USPS itself asserts that it has authority to adopt the Final Rule's measures "to . . . help protect the integrity of federal elections." 91 Fed. Reg. at 54969.

USPS (18-20) and Intervenors (18-19) also argue that even if the Rule *does* regulate elections, Congress has delegated to USPS some election-related responsibilities. But, as discussed above, none of the statutes they cite remotely

authorizes USPS to determine who may receive a mail ballot. USPS has instead interposed itself between states and eligible voters, interfering with state election regimes. The Constitution provides the Executive no such power.

Finally, USPS's contention (15) that Plaintiffs must satisfy the heightened standard of *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665, 681-82 (2025) (*NRC*), is incorrect. That framework does not govern Plaintiffs' constitutional claim, which is independently cognizable and is not "treated differently than every other constitutional claim." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Nor does *NRC* impose its heightened standard on Plaintiffs' statutory claims. *NRC* addresses equitable suits brought outside an otherwise available statutory review scheme. Where, as here, Congress has provided no alternative statutory review scheme for reviewing the challenged action, plaintiffs may invoke the courts' equitable authority "without a congressionally-provided cause of action to prevent an injurious act by a public officer"—and without satisfying the *NRC* standard. *Trump v. Cook*, 146 S. Ct. 2234, 2251 n.2 (2026) (internal quotation marks omitted) (reviewing claim that executive action violated the Federal Reserve Act without applying the *NRC* standard); *id.* at 2275 (Thomas, J., dissenting); *see also, e.g.*, *Learning Res., Inc.*, 607 U.S. at 240 (reviewing claim that executive action violated the International Emergency Economic Powers Act without applying the *NRC* standard). Regardless, Plaintiffs easily satisfy that

standard because, for the reasons discussed, the Rule plainly contravenes clear and specific statutory mandates.

## II. THE REMAINING STAY FACTORS WEIGH AGAINST A STAY.

### A. Defendants Have Not Shown Irreparable Harm from a Narrow TRO Where the Preliminary Injunction Hearing is in Less Than Two Days.

To obtain a stay, Defendants must show they will suffer irreparable harm before the district court can rule on the preliminary injunction motion. *See Dep't of Educ.*, 604 U.S. at 652 (finding irreparable harm because government was unlikely to recover funds required to be disbursed before preliminary injunction ruling). Here, Defendants have not shown that they are likely to suffer irreparable harm at all, let alone pending the imminent preliminary injunction hearing and ruling.

First, neither USPS nor Intervenors can be "irreparably harmed" by an injunction "barr[ing] implement[ation]" of "unlawful agency action." *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 74-75 (1st Cir. 2025). Defendants cannot show irreparable harm because they have not shown that they are likely to succeed in demonstrating the Final Rule is lawful. USPS's reliance (7-9) on the irreparable harm articulated by the Supreme Court when it stayed the Executive Order injunction is misplaced. There the Court noted the injunction would limit the ability of the Executive Branch to communicate within itself. *See California*, 2026 WL 2473573, at *1. Here, at issue is the purported harm to the Executive in implementing

unlawful policy decisions. Frustration of any Executive's policy preference does not warrant a stay absent likely success on the merits. *See, e.g.*, *Biden v. Texas*, 142 S. Ct. 926, 926 (2021) (mem.) (denying stay of injunction against President's border policy, despite foreign relations implications, because federal government "failed to show a likelihood of success" on appeal); *New Jersey v. Trump*, 131 F.4th 27, 41 (1st Cir. 2025).

Second, Defendants have not made the requisite factual showing of harm. USPS failed to assert any irreparable harm whatsoever in its opposition to Plaintiffs' TRO motion and thereby forfeited the argument. *See Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 26-CV-10877, 2026 WL 1758422, at *2 (D. Mass. June 18, 2026) ("[A] motion for stay is not a vehicle for presenting new legal theories or issues."). USPS now relies on the asserted need to verify mail ballot envelopes sent by North Carolina and Alabama as the sole basis for its harm but fails to explain how a federal agency with no role in election administration is irreparably harmed when a state's ballot mail is sent out pursuant to a state's election laws.

Intervenors meanwhile make only general claims (5, 26) about why the TRO will purportedly harm the states "by the loss of election integrity measures . . . [and] lawful election security measures." But the TRO permits those states to voluntarily comply with the Rule's requirements if they desire. That itself is dispositive. Nor does the TRO touch Intervenors' ability to enact their own statutes and regulations

to promote "election integrity" (provided they comply with constitutional guarantees and federal law).

To explain their interest in USPS's "security measures," Intervenors offer (5, 28) only the Missouri Secretary of State's vague declaration that the TRO "would likely bar Missouri from fully complying with the Rule—and benefitting from the increase in security to mail voting it would guarantee—during the 2026 General Election." ECF 234-1 at 3. This statement is factually incorrect—as the TRO *allows* Missouri to voluntarily comply with the Rule's envelope design specifications and portal participation, and in all events, runs only through September 10—and unsubstantiated as to how USPS's delivering a ballot that complies with Missouri state law and is sent by a state official would irreparably harm Missouri's interests. At bottom, Intervenors' vaguely asserted, abstract policy interest is insufficient to show irreparable harm. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020) (finding no harm to state interest when "the incremental interest in the specific regulation at issue . . . is marginal at best"); *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 34 (1st Cir. 2001) (finding asserted irreparable harm to be vague and insufficiently concrete).

### B. The Equities and Public Interest Strongly Counsel Against a Stay.

Defendants failed to show a stay will not "substantially injure the other parties interested in the proceeding" and that it serves "the public interest." *Nken*, 556 U.S.

at 426 (citation omitted). In contrast, Plaintiffs will suffer irreparable harm if the TRO is stayed, and the public interest favors protecting the fundamental right to vote. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

*First*, staying the TRO would cause irreparable harm by allowing USPS to implement the Final Rule despite the high likelihood it will impede voters' abilities to receive mail ballots. Voting by mail is a critical feature of U.S. elections with USPS delivering over 99 million ballots in the November 2024 elections.[4] But under the Rule, USPS will refuse to transmit ballots to voters if election officials cannot meet the extraordinarily rushed timeframe to design new ballot envelopes, receive USPS approval of those envelopes, develop the Absentee and Mail-In Participation Lists and submit them into a new, untested USPS portal—not to mention the likelihood of technical errors during the portal's hurried rollout, and the fact that the failure of a single barcode to properly scan  could prevent the mailing of thousands of ballots. *See* Whistleblower Rep. at 6-10.[5] As a result, certain eligible voters will

---

[4] USPS, *U.S. Postal Service Releases 2024 Post-Election Analysis Report Detailing the Successful Efforts Taken to Deliver the Nation's Election Mail Securely and Effectively* (Dec. 2, 2024), https://about.usps.com/newsroom/national-releases/2024/1202-usps-releases-2024-post-election-analysis-report.htm [https://perma.cc/BX6M-3HQH].

[5] All of these concerns are compounded by the fact that the Final Rule includes no mechanism for voters themselves to challenge USPS's rejection of a mail ballot envelope, or even a clear pathway for them to become aware of that fact in the first place.

not receive their ballots and others will decide not to request a mail ballot due to a justifiable fear of not receiving it.

USPS states (11) that Alabama, one of the Intervenors, "has never argued that it would be impossible to comply with the rule"—yet Alabama has declined to submit a declaration about feasibility of implementation, and Defendants' argument subverts its burden as the party seeking emergency relief. The near-certain disruption of the voting process is contrary to the public interest, which favors ensuring "an unhampered, unconditioned vote." *Mancuso v. Taft*, 476 F.2d 187, 193 (1st Cir. 1973). A stay would also unsettle, on the eve of ballot mailing, the rules under which every state has operated, while the TRO merely preserves them. *See supra* I.A. The critical risk to the midterm election is further confirmed by the new disclosures in the Whistleblower Report (10-11) which show that USPS's haphazardly and chaotically assembled processes are not ready and will "prevent states from mailing enormous numbers of ballots."

*Second*, the TRO preserves the ability of nonpartisan voter-service organizations to carry out their core missions. Plaintiffs are in a crucial period, in the weeks before election day, assisting and educating the many eligible voters who are requesting their mail ballots or deciding whether to request one. They lack sufficient time to complete the work necessary to be prepared for the Rule's implementation, and if it's implemented, would be "unable to assist many . . . voters through . . . voter

outreach efforts," *N.H. Youth Movement v. Scanlan*, 830 F. Supp. 3d 199, 213-14 (D.N.H. 2026). Without the TRO, Plaintiffs will have to forego some of their time-sensitive election-year work like registering voters and providing information on how to vote and instead amend existing materials and undertake mass outreach campaigns to address confusion about mail voting the Rule creates.

*Third*, the TRO serves the public interest by respecting the separation of powers and existing federal law. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *Somerville Pub. Schs.*, 139 F.4th at 76 (citation omitted).

## III. THE SCOPE OF RELIEF IS PROPER.

The district court's TRO is appropriately tailored to offer "complete relief *to the plaintiffs before the court*." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). Collectively, Plaintiff organizations educate voters and facilitate mail voting in all 50 states, D.C., and many other countries, and their millions of members—many of whom rely on mail voting—similarly live in all 50 states, D.C., and dozens of foreign countries. *See supra* I.B.1. It is thus impossible to afford Plaintiffs the requisite "complete relief" through narrower relief. *CASA, Inc.*, 831 U.S. at 851-52 & n.12.

Intervenors (27-28) lament that the TRO extends more broadly than this Court's affirmation of earlier relief in *California v. Trump*.[6] But here, in addition to the 23 Plaintiff States and D.C., the Plaintiff organizations and their members, who are voters across the country, are also entitled to necessary relief. Intervenors wholly fail to address the full scope of Plaintiffs' harms in this case.

Intervenors (10) similarly miss the mark regarding the alleged impact on states who wish to "*voluntarily* follow" the Rule. As USPS itself has instructed its employees, the TRO does not prevent voluntary compliance with most of the Rules' provisions, including mail ballot envelope design and portal participation. ECF 227-1. Nor does it apply to elections beyond November 3, 2026. ECF 227. Instead, the TRO's only mandatory prohibition that extends to all 50 states is preventing USPS from rejecting mailings that do not comply with the Final Rule's requirements for elections before or on the November 3, 2026, election. ECF 218. This tailored relief is no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA, Inc.*, 606 U.S. at 861.

## CONCLUSION

The Court should deny Defendants' motions for an administrative stay and for a stay pending appeal.

---

[6] USPS does not contest the scope of relief.

Dated: September 1, 2026

Respectfully submitted,

LEAGUE OF WOMEN VOTERS OF MASSACHUSETTS, LEAGUE OF WOMEN VOTERS LOTTE E. SCHARFMAN MEMORIAL EDUCATION FUND, LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEAGUE OF WOMEN VOTERS EDUCATION FUND, ASSOCIATION OF AMERICANS RESIDENT OVERSEAS, U.S. VOTE FOUNDATION, OCA-ASIAN PACIFIC AMERICAN ADVOCATES, DELTA SIGMA THETA SORORITY, INC.

By and through their attorneys,

*/s/ Sophia Lin Lakin*
Sophia Lin Lakin
Theresa J. Lee
Davin Rosborough
Ethan Herenstein
Jonathan Topaz
Ming Cheung
William Hughes
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

Sarah Brannon
Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005

Leah C. Aden
Brenda Wright
John S. Cusick

Jessie J. Rossman
Suzanne Schlossberg
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108

Eliza Sweren-Becker
Wendy Weiser
Andrew B. Garber
BRENNAN CENTER FOR JUSTICE AT
NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271

Justin Lam
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100

Washington, DC 20001

Niyati Shah
Noah Baron
Ejaz Baluch, Jr.
ASIAN AMERICANS
ADVANCING JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036

Miranda Galindo
Latino Justice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

I. Sara Rohani
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005

## CERTIFICATE OF COMPLIANCE

This motion contains 6,468 words. On August 31, 2026, USPS and Intervenors each filed a motion for an administrative stay and a stay pending appeal. Rather than file two separate oppositions of 5,200 words each in accordance with word limit of Federal Rule of Appellate Procedure 27(d)(2)(A), Plaintiffs' counsel conferred with counsel for Defendants and Intervenors regarding the submission of a single, combined opposition of no more than 6,500 words. Defendants and Intervenors do not oppose this request. As a result, simultaneous with the filing of this opposition, Plaintiffs have filed an unopposed motion for leave to file a combined opposition of no more than 6,500 words. The motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared using proportionally spaced 14-point Times New Roman typeface.

*/s/ Sophia Lin Lakin*
Sophia Lin Lakin

Dated: September 1, 2026

## CERTIFICATE OF SERVICE

I hereby certify that this document is served on today's date to all registered users of the court's e-filing system who have appeared in this case by the court's electronic filing system.

/s/ Sophia Lin Lakin
Sophia Lin Lakin

Dated: September 1, 2026